NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0373n.06

Case No. 20-6316

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 29, 2021
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| DRAVEN GREENE, | ) | KENTUCKY |
| Defendant-Appellant. | ) ) ) | |

BEFORE: SILER, MOORE, and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** Draven Greene appeals the denial of his motion to suppress evidence that police officers obtained after conducting a warrantless search of his vehicle. In denying his motion, the district court found that because the "community-caretaker" exception applied, the search was not performed in violation of the Fourth Amendment. We find that the record demonstrates that the officers engaged in "community-caretaking" functions, and therefore AFFIRM the district court's denial of Greene's motion to suppress.

**I.**

At around 2:00 a.m. on July 23, 2019, Richmond, Kentucky, police officers responded to a dispatch call indicating that a pizza delivery driver's vehicle had been stolen. The responding officers were James Colyer and Daniel Kirstein, and they drove in separate police cruisers to the suspected scene of the crime. While conducting his initial search of the area, Colyer noticed a

Pontiac G6 in a Waffle House parking lot that had its headlights on and was running. This took place "sometime after 2:00 [a.m.]" At around 3:00 a.m., Colyer located the stolen vehicle.

Later that morning—after the stolen vehicle matter was resolved—the officers each observed the Pontiac in the Waffle House parking lot. Kirstein saw the car just before 4:00 a.m.; Colyer spotted it at approximately 4:50 a.m. The car's headlights were on and its engine was running during both instances.

When Colyer witnessed the car the second time, he decided to determine if anyone was in the vehicle.[1] Colyer approached the vehicle, shined his light into the car, and discovered that there were two individuals, Draven Greene and Helen Smith—in the driver's and passenger's seats, respectively—who appeared to be sleeping or unconscious.[2]

Colyer then attempted to wake Greene and Smith. He "knocked on the window very loudly," and shined his light into the driver's side window. Less than a minute later, Smith woke up, but Greene did not.

At this point, Kirstein had also approached the car on the passenger's side. Once he arrived, he "immediately noticed a black handgun . . . laying against the center hump of the rear floorboard on the passenger side." After making this observation, Kirstein "stated in his mic [to Colyer] that there was a gun in the vehicle, . . . reached over the top of the car[,] and made . . . a finger gun" to alert Colyer about his finding.

Subsequently, Colyer, who "figured. . . [Greene] needed some kind of a welfare check just to make sure he was okay[,]" opened the driver's side door. He proceeded to pat Greene several

---

[1] Colyer testified that from where his car was positioned on the road near the parking lot, he could not tell if anyone was in the Pontiac because of the car's tinted windows.

[2] It is unclear whether Colyer immediately thought that Greene and Smith were unconscious or sleeping. Colyer testified at an evidentiary hearing that he believed both individuals were "asleep, or unconscious[.]" But in his police report, Colyer indicated that "they were both asleep."

times on the arm, and said "Sup man, you alright?" Greene did not respond. Colyer then said to Greene, "[y]ou take anything today or you just sleeping?"[3] Greene replied that he was just sleeping.

After Colyer opened the driver's side door, the officers detected the odor of marijuana. Colyer smelled the marijuana through the open door. Kirstein smelled the marijuana through the passenger-side window that he directed Smith to roll down.[4]

Next, the officers directed the occupants to exit the vehicle so that they could conduct a search of the car. Upon initiating their search, the officers found one pound of methamphetamine and a firearm. The officers testified that they thought it was necessary to perform the search because they smelled marijuana coming from the vehicle. Colyer testified that the fact that there was a firearm in the vehicle was another reason why they executed the search.

Greene was arrested and charged with possessing with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (Count One); possessing a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Two); and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count Three). Thereafter, he moved to suppress all of the evidence obtained from his vehicle on July 23, 2019, arguing that by Colyer opening his door without a warrant or probable cause, the search that followed violated his Fourth Amendment rights.[5] The government argued that because the community-caretaker exception to the Fourth Amendment's warrant requirement was applicable, Greene's constitutional

---

[3] When asked at an evidentiary hearing about the number of recent drug overdoses in their area, the officers testified that there had been a significant number of opioid overdoses in Madison County (which includes Richmond), and that they each have had to respond to overdose scenes.

[4] Kirstein testified that Smith rolled down her window subsequent to Colyer opening the driver's side door.

[5] Greene only argued that the initial entry into the vehicle—and not the actual search—was unlawful.

rights were not violated, and therefore, the evidence recovered from Greene's vehicle should not be suppressed.

The suppression motion was referred to a magistrate judge. The magistrate judge held an evidentiary hearing at which both Colyer and Kirstein testified. Following the hearing, the magistrate judge issued a report and recommendation that Greene's motion be denied because the community-caretaker exception applied to the officer's act of opening the vehicle's door. The magistrate judge concluded that because it "appeared to [the officers] that Greene was possibly unconscious and/or in need of medical attention, . . . the intrusion into his privacy of opening the car door was reasonable under those circumstances." The district court adopted the magistrate judge's report and recommendation and denied Greene's motion.

Greene later entered into a conditional plea agreement. Under the terms of the plea agreement, in exchange for Greene pleading guilty to Counts One and Two, the government agreed to dismiss Count Three. Greene also preserved the right to appeal the district court's denial of his suppression motion.

This timely appeal followed.

## II.

Greene's appeal is based on his assertion that the district court erred by denying his motion to suppress. When reviewing a district court's judgment on a motion to suppress, we review its factual findings for clear error and its legal conclusions *de novo*. *United States v. Lyons*, 687 F.3d 754, 762 (6th Cir. 2012). We are also required to construe the evidence in the light most favorable to the government when evaluating the district court's denial of a defendant's suppression motion. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "It is well settled under the Fourth Amendment that a warrantless search is *per se* unreasonable subject only to a few specifically established and well-delineated exceptions." *United States v. Trice*, 966 F.3d 506, 512 (6th Cir. 2020) (quoting *Morgan v. Fairfield Cty.*, 903 F.3d 553, 560–61 (6th Cir. 2018)).

One recognized exception is that the Fourth Amendment's warrant requirement does not apply if an officer engages in community-caretaking functions—as opposed to traditional law enforcement functions. *See United States v. Rohrig*, 98 F.3d 1506, 1521 (6th Cir. 1996) (citing *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). For this exception to apply, the actions of an officer must be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady*, 413 U.S. at 441; *Taylor v. City of Saginaw*, 922 F.3d 328, 335 (6th Cir. 2019). The community-caretaker exception can only "provide the government with refuge from the warrant requirement [if] delay is reasonably likely to result in injury or ongoing harm to the community at large." *United States v. Washington*, 573 F.3d 279, 289 (6th Cir. 2009).

Greene contends that the community-caretaker exception to the Fourth Amendment's warrant requirement is inapplicable as it relates to the initial entry of his vehicle on July 23, 2019. Specifically, Greene argues that the government's "dual purpose" for opening the vehicle's door without a warrant—(1) to ensure that Greene was safe; and (2) to secure the firearm in the vehicle and investigate the firearm possession—is inconsistent with our Court's rule that the community-caretaker exception only applies if law enforcement's sole purpose for a warrantless search relates

to its community-caretaking role. He cites to *United States v. Lewis*, 869 F.3d 460 (6th Cir. 2017) in support of his argument.

The facts in *Lewis* are somewhat similar to the facts of the instant case. There, police officers responded to a report that a woman was intoxicated inside of a Wal-Mart, found this woman in the store, and determined that she was clearly under the influence of alcohol. *Lewis*, 869 F.3d at 461. After the woman mentioned to the officers that her boyfriend, the defendant, was in his truck in the parking lot, the officers accompanied the woman to the defendant's vehicle to make sure that he was in the proper state to drive her home. *Id.* When they arrived at the defendant's vehicle, the officers noticed that he was asleep in the passenger's seat. *Id.* One of the officers then opened the passenger-side door. *Id.* Once the door was opened, the defendant appeared startled and tossed a clear baggie onto the back floorboard. *Id.* at 462. Consequently, the officers searched the truck, discovered narcotics, and arrested the defendant. *Id.* Our Court held that because the officers intended solely to determine whether the defendant was able to drive his girlfriend home, the community-caretaker exception applied, and the search did not violate the defendant's Fourth Amendment rights. *Id.* at 462–63.

The facts here demonstrate that the officers had even more reason to suspect that Greene needed some sort of medical assistance. Colyer and Kirstein both witnessed Greene's car in the Waffle House parking lot with the headlights on and its engine running. Based on when Colyer saw the vehicle at the two different times in the morning, it was reasonable for him to assume that Greene's car had been in the same spot for hours. Further, before the initial entry, Colyer loudly knocked on Greene's door and shined his light into Greene's window. Greene, however, did not respond to the banging or the light. Additionally, the officers were well aware that there were a number of recent opioid overdoses in their area. Colyer therefore reasonably initiated the search

by way of opening the driver's side door because he logically thought that Greene might have suffered from a drug overdose.

Greene's argument that when Colyer initially entered the vehicle, the officers were additionally attempting to investigate whether Greene possessed or used the firearm illegally is unavailing. Greene has not presented any evidence demonstrating that either of the officers believed that Greene illegally possessed the firearm or had used it in connection with another crime. Although the officers knew a firearm was in the vehicle, the record supports the conclusion that they were only interested in gaining access to the gun for the sake of the safety of all individuals in and near the vehicle. Accordingly, because the record indicates that Colyer initially entered the vehicle as part of a community-caretaking role, Greene's "sole purpose" contention lacks merit.

Greene additionally asserts that the district court's ruling conflicts with cases in which we have held that the community-caretaker exception only applies if an officer acted with "true immediacy." *See Washington*, 573 F.3d at 288. It is accurate that we have held that the applicability of the community-caretaker function hinges on whether an officer's delayed action would result in an injury or harm to the community. *Id.* However, based on the facts of this case, the officers had legitimate reason to be concerned that Greene's well-being was in jeopardy. If Greene had overdosed on drugs, it would have been imperative for the officers to act quickly. Moreover, our Court has applied the exception to the warrant requirement that is at issue when the circumstances did not require officers to act with the same level of immediacy that confronted the officers who entered Greene's vehicle. *See Lewis*, 869 F.3d at 462–63. Therefore, we conclude that under the circumstances, there was a potential risk of injury to Greene had Colyer not opened the driver's side door to determine if Greene required medical assistance.

Finally, Greene argues that the evidence obtained as a result of the officers' search should be excluded due to the exclusionary rule. We disagree.

The exclusionary rule is a prudential doctrine created by the Supreme Court to preclude the prosecution from introducing evidence obtained as a result of a Fourth Amendment violation. *Davis v. United States*, 564 U.S. 229, 231–32, 236 (2011). "The rule's sole purpose…is to deter future Fourth Amendment violations." *Id.* at 236. When establishing this rule, the Supreme Court effectively created a balancing test that required courts to assess whether the benefits of deterrence outweigh the costs of excluding evidence unlawfully acquired. *Herring v. United States*, 555 U.S. 135, 141 (2009); *United States v. Master*, 614 F.3d 236, 243 (6th Cir. 2010).

Here, because the officers acted reasonably under the circumstances, there is no need to deter future similar conduct. As the magistrate judge pointed out, the exclusionary rule was not created to deter acts that constitute community-caretaker functions. Accordingly, we find no violation of the exclusionary rule.

**III.**

For the foregoing reasons, we AFFIRM the district court's judgment.